UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————
                      :

In re                          :         Chapter 11
                      :

ENRON CREDITORS RECOVERY CORP.,    :         Case No. 01-16034 (AJG)
                      :         Confirmed Case
           Debtors.         :

—————————————————————————:
                      :

THE OFFICIAL COMMITTEE OF        :
UNSECURED CREDITORS OF ENRON     :
CORP., *et al.*, on behalf of ENRON CORP.,  :
                      :
          Plaintiff,        :
                      :

        v.                  :         Adv. Pro. No. 03-93617A
                      :

AMANDA K. MARTIN,           :
                      :
          Defendant.      :

—————————————————————————:
                      :

AMANDA K. MARTIN,           :
                      :
          Third-Party Plaintiff,  :
                      :

        v.                  :
                      :

ENRON CORP., AZURIX CORP.,       :
AZURIX NORTH AMERICA CORP., AND  :
AWS CORP. a/k/a AWS (Water/Wastewater) :
CORP. f/k/a AZURIX NORTH AMERICA  :
CORPORATION,               :
                      :
          Third-Party Defendants.  :

—————————————————————————:

OPINION CONCERNING (I) MOTION OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR SUMMARY JUDGMENT ON ITS CLAIM TO AVOID AND RECOVER
TRANSFER TO DEFENDANT AMANDA K. MARTIN AND ON DEFENDANT'S
COUNTERCLAIMS/THIRD-PARTY CLAIMS FOR BREACH OF CONTRACT AND
FRAUD; (II) AMANDA K. MARTIN'S MOTION FOR SUMMARY JUDGMENT AS TO
PLAINTIFF/COUNTER-DEFENDANT AZURIX CORP.; AND (III) MOTION FOR

SUMMARY JUDGMENT OF COUNTER-DEFENDANT AWS CORP., A/K/A AWS
(WATER/WASTEWATER) CORP., F/K/A AZURIX NORTH AMERICA CORP.


APPEARANCES:

MILBANK, TWEED, HADLEY & McCLOY LLP
New York, New York
Counsel for the Official Committee of
         Unsecured Creditors of Enron Corp.

              By:    Thomas A. Arena, Esq.
                     Joshua Killion Porter, Esq.
                          Of Counsel

BOYAR & MILLER
Houston, Texas
Counsel for Amanda Martin

              By:    David M. Bond, Esq.
                     Chris Hanslik, Esq.
                     Crystal J. Parker, Esq.
                          Of Counsel

        -and-

GRAUDBARD MILLER
New York, New York
Counsel for Amanda Martin

              By:    Alan S. Liebman, Esq.
                     Caryn L. Marcus, Esq.
                          Of Counsel

HAHN & HESSEN LLP
New York, New York
Counsel for AWS Corp.

              By:    Rosanne Thomas Matzat, Esq.
                          Of Counsel

STRADLEY RONON STEVENS & YOUNG
Cherry Hill, New Jersey

2

Counsel for AWS Corp.

By:    Francis X. Manning, Esq.
       Ellen Rosen Rogoff, Esq.
          Of Counsel

ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

*Facts*

Commencing on December 2, 2001, and from time to time continuing thereafter, Enron

Corp. ("Enron Corp" or "Enron") and certain of its affiliated entities (collectively, the

"Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code"). On July 15, 2004, the Court entered an Order confirming the

Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in

these cases. The Plan became effective on November 17, 2004.

In 1991, Amanda K. Martin ("Martin") began to work for an Enron affiliate, Enron Gas

Services. Subsequently, she worked for the affiliate's successor entity, Enron Capital and Trade

("ECT"). There her responsibilities included origination of financing and working on various

contracts with utilities. In 1993, Martin left ECT's legal department to oversee the company's

four domestic power plants. Following that, she worked for Enron Joint Venture Management

("Enron Venture") and was responsible for power plants that Enron Venture was developing

worldwide. By 1996, at the request of Jeffrey Skilling, who was President and Chief Operating

Officer of ECT and who would be her supervisor, she returned to ECT as president of its North

American Services Origination and Finance division. In that position, she managed long-term

commodity contracts.

3

On June 1, 1998, Martin entered into an executive employment agreement with ECT effective January 1, 1998 for a term to expire on December 31, 2000 (the "Employment Agreement").  In paragraph 1.2, the Employment Agreement provides that the "[e]mployer may assign [the Employment] Agreement and [Martin's] employment to [Enron] or any affiliates of [Enron]; provided, however, that [the employer] will not transfer [Martin] to a position outside of Houston, Texas without [Martin's ] consent."

In 1998, Azurix was formed as an affiliate of Enron for the purpose of building a water services company through a strategy of bidding and acquiring water concessions worldwide. Enron owned a portion of Azurix directly and a portion indirectly.  In fall 1998, Martin joined Azurix as Executive Director and President of the Americas, reporting directly to Azurix's Chairman and CEO (the "Azurix CEO").  As part of Azurix's strategy of growth through acquisition, Martin bid on and acquired concession contracts.

On October 29, 1998, in connection with her move to Azurix, an amendment to the Employment Agreement was executed among ECT, Azurix and Martin.  The amendment assigned the Employment Agreement to Azurix, which assumed it.  As amended, the Employment Agreement extended the period of her employment to August 31, 2003, and increased her salary and potential performance-based bonuses.  On March 1, 1999 Azurix and Martin entered into an agreement again amending the Employment Agreement effective February 1, 1999.  This amendment reduced Martin's compensation in preparation for an initial public offering, with Martin expecting to receive the amount by which it was reduced at a later time.

Under the amended Employment Agreement, in the event Martin were involuntarily

4

terminated, she would be entitled to her monthly salary for the remaining term of the agreement to be paid on a semi-monthly basis and any bonuses on an annual basis.

Azurix's business strategy to grow through acquisition was unsuccessful. By August 25, 2000, the Azurix CEO was replaced, and Enron decided to sell Azurix's assets to mitigate Enron's losses from its Azurix investment. Enron instructed Azurix to wind down its operations and to sell its assets piecemeal. In accordance with that strategy, it was determined that Azurix North America Corp. ( "ANA") and Azurix Industrial Corporation ("AIC"), two of Azurix Corp's subsidiaries, would be sold. As wholly-owned subsidiaries of Azurix, ANA and AIC were affiliates of Enron. Martin was heavily involved in the sale of these assets.

A Purchase Agreement was entered into among Azurix, American Water Services, Inc. and American Water Works Company, Inc, dated August 2, 2001, pursuant to which Azurix sold the stock of its subsidiaries ANA and AIC to American Water Services, Inc. The closing of the transaction was on November 7, 2001, at which time ANA and AIC were merged with the purchaser of the stock and the resulting company was named AWS Corp, a/k/a AWS (Water/Wastewater) Corp. ("AWS"). At the time of closing, Martin who had been an officer of both ANA and AIC, resigned those positions. Although Martin had been an officer of both ANA and AIC, she did not receive any compensation directly from either one. Nor had either ANA or AIC issued any W-2 forms to her.

Once Azurix began to "wind down" its operations, Martin's role at the company diminished. Azurix set up a key employee retention bonus pool, however, Martin was not included in it because it was contemplated that she either would be terminated by Azurix or would return to Enron. Around this time, Martin began her efforts to move back to Enron.

5

As part of Azurix's administrative cost saving efforts during its wind down, certain of Azurix's employees were moved onto Enron's payroll system and began drawing salaries from Enron. Azurix reimbursed Enron for payroll expenses for certain employees that were providing services to Azurix. Commencing approximately June 2001, salary and other payments to Martin were made by Enron. However, Enron maintains that its business records do not reflect that those payments were reimbursed by Azurix.

The parties dispute the significance of Enron issuing the salary and other payments to Martin. Enron and Azurix contend that, as permitted by paragraph 1.2 of the Employment Agreement, the agreement was assigned to Enron and Martin became an Enron employee at that time. Martin argues that she continued as an Azurix employee and her payments were issued by Enron only because she was transferred to a "work order" number for Enron for the purpose of obtaining certain benefits. She contends, however, that she continued as an Azurix employee and that it was intended that Azurix would reimburse Enron for the payments.

In August 2001, Martin began negotiating an employment termination agreement with Enron's CEO (the "Enron CEO"). While the Enron CEO formerly had held a board position at Azurix, he had not held that position, or any other position, at Azurix for several months prior to the commencement of the negotiations. In addition, the Enron CEO was not an officer or director of either ANA or AIC.

On October 22, 2001, Martin and Mary Joyce, the Vice President of Executive Compensation at Enron, executed the separation Agreement (the "Separation Agreement") that Martin had negotiated with the Enron CEO. The introductory paragraph of the Separation Agreement indicates that it is between "Enron Corp. and its affiliates" - which grouping is

defined as "Company" - and Martin.  A more inclusive definition of "Company" is contained in

paragraph 7.1 of the Separation Agreement, which defines it to "include Enron Corp., and all of

its subsidiaries and affiliated companies, and their officers, directors, employees, representative,

and attorneys."

      While those sections indicate that the Separation Agreement was entered into by

"Company" - however defined - and Martin, the signature line does not include the term

Company.  Rather, the signature line only contains a reference to Enron Corp.  There was no

reference to Azurix, ANA, AIC, AWS or even Company on the signature line.  In addition, the

contract was signed only by an employee of Enron Corp, who was its Vice President of

Executive Compensation.  No executive or other employee of Azurix, ANA, AIC or AWS

signed the Separation Agreement.

      Pursuant to the Separation Agreement, Martin was to receive $2,817,000 (the "Separation

Payment") within 30 days of execution of the Separation Agreement.  The Separation Agreement

was intended to address any obligations to Martin under the Employment Agreement and

contained a release by Martin of all future claims against Enron Corp, its subsidiaries and

affiliates.  The Separation Agreement provided that Martin's termination of employment would

be effective January 31, 2002.

      Martin continued to work on several transactions that proved lucrative to Azurix,

including the sale of ANA and AIC to AWS.  Martin also continued to draw her monthly salary

from Enron until January 2002.  At that point, there were 19 months left on the term of her

Employment Agreement.

      On November 15, 2001, 17 days before Enron filed for bankruptcy protection, Enron

7

made the Separation Payment. Enron maintains that its business records do not reflect that it was reimbursed by Azurix or any other of Enron's subsidiaries or affiliates for the payment made to Martin.

On December 1, 2001, the Official Committee of Unsecured Creditors ("the "Committee") filed a complaint seeking to avoid the Separation Payment made to Martin as a preference or fraudulent conveyance.[1] Martin filed a complaint, which was subsequently amended, asserting counterclaims against Enron and third-party claims against Azurix and AWS, as successor to ANA, for breach of contract and fraud. On October 18, 2006, the parties completed fact discovery.

On January 26, 2007, the Committee moved for summary judgment on Enron's claim that its transfer of the Separation Payment is an avoidable preference. The Committee also seeks summary judgment in its favor concerning Martin's counterclaims against Enron and third-party complaint against Azurix for breach of contract and fraud. On January 26, 2007, AWS also moved for summary judgment in its favor concerning Martin's third-party complaint against it. On January 26, 2007, Martin moved for summary judgment against Azurix on her claims that the Employment Agreement was breached. In addition, if there is a determination that she must return the $2.8 million payment to Enron as a preference, then she seeks a declaratory judgment that Azurix is liable for that amount, as well. Alternatively, if Azurix is found not to be a party to the Separation Agreement, Martin seeks summary judgment against Azurix pursuant to the terms of the Employment Agreement. Martin opposes the motions for summary judgment filed by the Committee and AWS; and the Committee opposes Martin's motion for summary

---

[1]The Committee originally filed the avoidance action on behalf of Enron and Azurix. However, because Azurix is a non-debtor, the Committee concedes that it pursues the avoidance action only on behalf of Enron.

8

judgment against Azurix.  On May 24, 2007, a hearing (the "Hearing") was conducted before the

Court on the motions for summary judgment.

*Discussion*

Fed. R. Civ. P. 56(c) incorporated into bankruptcy practice by Fed. R. Bankr. P. 7056

provides that summary judgment shall be rendered "if the pleadings, depositions, answers to

interrogatories, and admissions of file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Rule 56(c) specifies that to preclude summary judgment, the fact in dispute must be

material.  Substantive law determines the facts that are material.  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  If a fact is material, it is then

necessary to see if the dispute about that material fact is genuine, "that is, if the evidence is such

that a reasonable jury could return a verdict for the non-moving party."  *Liberty Lobby*, *Id*., at

248.  If the fact may be reasonably resolved in favor of either party, then there is a genuine

factual issue that may only be resolved by the trier of facts and summary judgment will be

denied.  *Id.* at 250.  If, however, the evidence "is so one-sided that one party must prevail as a

matter of law," then summary judgment will be granted.  *Id*. at 252.  On considering a motion for

summary judgment, the evidence is viewed in the light most favorable to the non-moving party.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142

(1970).

After the non-moving party to the summary judgment motion has been afforded a

sufficient time for discovery, summary judgment must be entered against it where it fails to

make a showing sufficient to establish the existence of an element essential to its case and on

9

which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317,322 106 S.Ct.

2548, 2552 (1986). It is said that there is no genuine issue concerning any material fact because

"a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." 477 U.S. at 323, 106 S.Ct. at 2552. In this

manner, the summary judgment standard is similar to the directed verdict standard under Fed. R.

Civ. P. 50(a). *Id.*

The summary judgment standard is interpreted in a way to support its primary goal of

"dispos[ing] of factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323-24, 106

S.Ct. at 2553. The summary judgment movant meets its burden by "'showing' . . . that there is

an absence of evidence to support the nonmoving party's case." 477 U.S. at 325, 106 S.Ct. at

2554.

Application of the summary judgment procedure is not a disfavored procedural shortcut,

but an integral part of the Federal Rules where there are no triable factual issues. *Celotex*, 477

U.S. at 327, 106 S.Ct. at 2555.

*Preferential Transfer*

Pursuant to section 547(b) of the Bankruptcy Code, a trustee may avoid any transfer of an

interest of the debtor in property - -

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was
made;
(3) made while the debtor was insolvent;
(4) made - -
(A) on or within 90 days before the date of the filing of the petition; or
(B) between 90 days and one year before the date of the filing of the petition, if
such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if - -
(A) the case were a case under chapter 7 of this title;

10

(B) the transfer had not been made;  and
(C) such creditor received payment of such debt to the extent provided by the
provisions of this title.

11 U.S.C. § 547(b).  Each element of section 547(b) must be established by a preponderance of

the evidence.  *New York Credit Adjustment Bureau, Inc. v. Just In-Materials Designs, Ltd. (In re

Vasu Fabrics, Inc.)*, 39 B.R. 513, 515 (Bankr. S.D.N.Y. 1984).  The policy considerations for

allowing a trustee to avoid preferential payments are to promote equitable distribution of the

debtor's assets and to deter creditors from racing to dismember a financially distressed company

sliding into bankruptcy.  *Lawson v. Ford Motor Co. (In re Roblin Industr., Inc.)*, 78 F.3d 30, 40

(2d Cir. 1996).

The Committee moves for summary judgment on Enron's claim that the Separation

Payment made to Martin, pursuant to the Separation Agreement, was a preferential transfer and

can be avoided.  The Committee argues that it has met all of the elements to establish that the

transfer was a preference and has made a prima facie showing to that effect.  In opposition,

Martin takes issue only with the contention that the transfer was "of an interest of the debtor in

property."

Martin argues that Enron has not carried its burden to establish that the transfer consists

of an interest of Enron in property.  While she concedes that the payment came from Enron, she

argues that it did not have a beneficial interest in the funds transferred because Azurix

reimbursed Enron for the transferred funds.  Specifically, Martin asserts that Enron and Azurix

were parties to a cost-sharing agreement whereby Enron would service the payroll of employees

performing services for Azurix and the latter would reimburse Enron for those payments.  Martin

argues that because the Separation Payment made to her was reimbursed by Azurix, Enron's

11

estate was not depleted.

Enron contends that Azurix did not reimburse it for the Separation Payment made to Martin.  In support of this contention, Enron directs the Court's attention to the testimonial and documentary evidence elicited during discovery.  In particular, Enron points to the deposition taken of Enron Corp. for which Enron designated as deponent its Managing Director and Chief Administrative Officer (the "CAO").

Martin sought to depose the Enron corporate representative on various issues, including certain specified topics.  As noted, pursuant to Fed. R. Civ. P. 30(b)(6),[2] Enron designated the CAO to testify on its behalf.  The Court concludes that based upon the testimonial and documentary evidence obtained in discovery, including the CAO's deposition, Enron has established that it has an interest in the property transferred.

Martin acknowledges that the Separation Payment was made by Enron with its name appearing as the issuer.  Further, the CAO - Enron's deponent-representative - testified that he reviewed Enron's accounting records concerning the Separation Payment and the records showed that the transfer was made by Enron.  He testified that he reviewed Enron's general ledger account from its computer accounting system ("SAP").  According to the CAO, that review showed that the general ledger for the last half of 2001 did not reflect any reimbursement

---

[2]Fed. R. Civ. P. 30(b)(6) provides that
     A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. A subpoena shall advise a non-party organization of its duty to make such a designation. The persons so designated shall testify as to matters known or reasonably available to the organization. This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these rules.

from Azurix to Enron for payroll expenses related to payments made to Martin.  The CAO

further testified that he reviewed the payroll detail from Enron's SAP, which individually listed

reimbursements from Azurix to Enron from September 15, 2001 to December 15, 2001 for wage

or severance payments.  This wage detail was prepared by Enron's accounting department for its

CAO, in his capacity as Enron's Rule 30(b)(6) deponent.  The wage reimbursement detail listed

reimbursements in the relevant period related to payments made to separate employees.  The

wage detail did not list any reimbursements related to any wage payment or severance payment

made to Martin.  Additionally, a Separation Payment detail was prepared by Enron's accounting

department at the request of the Enron's CAO, as a Rule 30(b)(6) deponent, in connection with

his investigation of the Separation Payment in preparation for the deposition.  The Separation

Payment detail reflects that Enron made the payment, however, there is no indication that it was

reimbursed by Azurix.

Martin challenges the admissibility of the evidence sought to be introduced by Enron

through its CAO.  She argues that the evidence is not admissible because the records referenced

by the CAO are hearsay as the deposition witness did not prepare them himself and was not their

primary custodian.  Enron disputes this and argues that the records are admissible pursuant to

Fed. R. Evid. 803(6)[3] and 803(7),[4] which contain exceptions to the hearsay rule for business records.

Pursuant to Fed. R. Evid. 803(6), and 803(7), a debtor's "financial statements, ledgers, journal entries and other accounting records . . . are not inadmissible hearsay." *In re Adelphia Communications Corp.*, No. 02-41729, 2006 WL 346418 *1 (Bankr. S.D.N.Y. Feb. 6, 2006). Rather, they are admissible business records that can be used to prove or disprove whether there are intercompany obligations. *Id*. at 2.

When the entry of business records is contemporaneous with the recorded event and if the entity relies on those records in conducting its commercial affairs, the records are ordinarily deemed trustworthy. *Conoco Inc. v. Dep't. Of Energy*, 99 F.3d 387, 393 (Fed. Cir. 1997). Inasmuch as records maintained in the regular conduct of a business are generally trustworthy and because such evidence is often necessary, "the business records exception has been construed generously in favor of admissibility." *Id*. at 391. Further, summaries of records are permissible if the records that are the basis of the summaries are admissible and made available

---

[3]Fed. R. Evid. 803(6) excepts from the hearsay rule records of regularly conducted activity such as
A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

[4]Fed. R. Evid. 803(7) excepts from the hearsay rule evidence of the absence of an entry in records kept in accordance with the provisions of paragraph (6) of Rule 803, specifically it allows
Evidence that a matter is not included in the memoranda reports, records, or data compilations, in any form, kept in accordance with the provisions of paragraph (6), to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and preserved, unless the sources of information or other circumstances indicate lack of trustworthiness.

to the opposing party for examination or copying.  Fed. R. Evid. 1006.[5]  It is within the

discretion of a trial court to determine whether a record has sufficient indicia of trustworthiness

to warrant its admission into evidence.  *AT&T Corp. v. Community Network Services,* Inc., No.

97 Civ. 316, 1999 WL 1267457 at 4 (S.D.N.Y. Dec. 29, 1999).

   "A business record may include data stored electronically on computers and later printed

out for presentation in court, as long as the original computer data compilation was prepared

pursuant to a business duty in accordance with regular business practice.  *AT&T*, 1999 WL

1267457 at 5.  The fact that the records were retrieved from a computer storage system during

litigation does not make them documents prepared for litigation.  *Spector v. Experian*

*Information Services. Inc.*, 321 F.Supp.2d 348, 353 (D. Conn. 2004).  Moreover, if employees

regularly retrieve data from the entity's computer system and rely on such information for

commercial purposes, they bear sufficient indicia of trustworthiness.  *AT&T*, 1999 WL 1267457

at 5.  Additionally, the party seeking to admit the evidence is not required to identify the specific

individual whose first-hand knowledge formed the basis of the entry as long as it was within the

regular practice of the business entity to get information from such individual.  *AT&T*, 1999 WL

1267457 at 5.  If evidence has probative value, Rule 803(b)(6) favors its admission rather than its

exclusion from evidence.  *American Equities Group, Inc. v. Ahava Dairy Products Corp.*, No. 01

Civ. 5207, 2004 WL 870260 * 9 (S.D.N.Y. April 23, 2004) (citations omitted).

   As previously noted, Martin's notice to Enron seeking to depose its 30(b)(6)

---

[5]Fed. R. Evid. 1006 provides that
   The contents of voluminous writings, recordings, or photographs which cannot
conveniently be examined in court may be presented in the form of a chart, summary, or
calculation. The originals, or duplicates, shall be made available for examination or copying, or
both, by other parties at reasonable time and place. The court may order that they be produced in
court.

representative included a listing of certain specific topics that were intended to be addressed. These topics included issues concerning cost sharing, management, services, credit or other similar agreements to which Enron and Azurix were parties that are related in any way to the payment of salaries, bonuses or benefits; any indemnity agreements between Enron and Azurix; and the factual basis for the claims asserted by plaintiffs against Martin. As such, the CAO presented the positions of the corporation on those issues. Thus, because the CAO was deposed in his capacity as Enron's Rule 30(b)(6) witness, he was designated to testify as to matters known or reasonably available to Enron. *L-3 Communications Corp. v OSI Systems, Inc.*, No. 02 Civ. 9144, 2005 WL 712232 *1 (S.D.N.Y. Mar. 28, 2005). As a Rule 30(b)(6) designee, the deponent presents the "positions" of the corporation on the relevant topics. *Id.* at 1. The designee's testimony represents the knowledge of the organization on the topic designated, not of the individual deponent. *McLellan Highway Corp. v. United States*, 95 F.Supp.2d 1, 9 (D. Mass. 2000).

In responding to a request for a Rule 30(b)(6) deponent, a corporation is not required to make available all individuals with knowledge of the topics at issue. *L-3 Communications Corp.*, 2005 WL 712232 at *1. Further, the Rule 30(b)(6) deponent is not required to have personal knowledge of the facts. *Id.* Rather, in preparation for the deposition, a Rule 30(b)(6) deponent must "educate himself as to the matters regarding the corporation" that are known or reasonably available to the corporation. *Concerned Citizens of Belle Haven v. Belle Haven Club*, 223 F.R.D. 39, 43 (D. Conn. 2004).

A corporation has the "responsibility to produce a [Rule 30(b)(6)] witness who can provide information within the corporation's knowledge or reasonably available to it" even if the

16

relevant "documents are voluminous and various people hold the information." *Belle Haven Club*, 223 F.R.D. at 43. The logical conclusion from this premise is that it is expected that the Rule 30(b)(6) witness will be provided with information both from records maintained by the entity and by others with knowledge of it.

Thus, if the underlying basis of the information qualifies as a business record, then the information that the entity's Rule 30(b)(6) deponent derives from that source is properly admissible. Therefore, it is necessary to discern if the CAO's evidence was derived from admissible business records. The sufficiency of foundation evidence is "assessed in light of the nature of the documents at issue; documents that are standard records of the type regularly maintained by firms in a particular industry may require less by way of foundation testimony than less conventional documents proffered for admission as business records." *Conoco*, 99 F.3d at 392. Further, "the 'custodian or other qualified witness' who must authenticate business records need not be the person who prepared or maintained the records, or even an employee of the record-keeping entity, as long as the witness understands the system used to prepare the records." *Conoco*, 99 F.3d at 391.

Here, the CAO was also the Managing Director of Enron and he testified based upon his knowledge as to the electronic preparation and maintenance of the records by the accounting department. The documents presented were prepared by Enron's accounting department from its SAP computer accounting system which was maintained in the ordinary course of business. In addition, Enron proffered a Fed. R. Evid. 902(11)[6] certification of Senior Counsel for Enron

---

[6]902 Fed. R. Evid. 902(11) is concerned with the self authentication of certified domestic records of regularly conducted activity. Specifically, Rule 902(11) provides that extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to

The original or a duplicate of a domestic record of regularly conducted activity that would be

Creditors Recovery Corp., successor to Enron Corp, to authenticate the underlying records as

qualifying for the business records exception.  Rule 902(11) permits the authentication of

business records by certification of a custodian or other qualified person without the requirement

for foundation testimony at trial if the opponent is given sufficient advance notice of the intent to

introduce that evidence and as long as the record and declaration is made available for

inspection.  *U.S. v. Laguerre*, 119 Fed. Appx. 458, 460-61 (4th Cir. 2005).  This notice provides

the opponent an opportunity to challenge the adequacy of the foundation set forth in the

declaration.  *Id*.  The certification must be from a person who would qualify to testify as a

custodial or other foundation witness.  5 WEINSTEIN'S FEDERAL EVIDENCE, § 803.08[8][b] (2d

ed.2004).

Here, in her 902(11) certification, the Senior Counsel declared that she had reviewed the

evidence presented to the Court by the CAO and that the documents had been derived from the

SAP computer system that "recorded the information contained in the documents at or near the

time of the occurrence reflected in the documents."  She further declared that the information

was made by, or from, information transmitted by a person with knowledge of it.  Additionally,

she declared that the underlying data and SAP from which the documentary evidence was

derived were maintained in Enron's normal course of business and were kept in the course of

---

admissible under Rule 803(6) if accompanied by a written declaration of its custodian or other
qualified person, in a manner complying with any Act of Congress or rule prescribed by the
Supreme Court pursuant to statutory authority, certifying that the record--
    (A) was made at or near the time of the occurrence of the matters set forth by, or from
    information transmitted by, a person with knowledge of those matters;
    (B) was kept in the course of the regularly conducted activity; and
    (C) was made by the regularly conducted activity as a regular practice.
A party intending to offer a record into evidence under this paragraph must provide written notice
of that intention to all adverse parties, and must make the record and declaration available for
inspection sufficiently in advance of their offer into evidence to provide an adverse party with a
fair opportunity to challenge them.

regularly conducted activity as a regular practice.  Thus, her assertions show that she had

familiarity with and understood the record-keeping system.  Moreover, this declaration was filed

on April 20, 2007, which provided Martin with notice of Enron's intent to rely on the declaration

more than one month prior to the Hearing.  In addition, the CAO's deposition, which referenced

the SAP system and other business records from which the summary reports were derived, was

conducted on October 4, 2006 and gave even earlier notice of the intent to rely on those

underlying business records.  Thus, Martin was provided with sufficient opportunity to seek to

test the adequacy of the summaries and the underlying business records.  Yet her challenge at the

Hearing was directed to the identity of the person who provided the certification because the

declarant had been Enron's in-house counsel.  There is no indication that Martin challenges the

accuracy or authenticity of the general ledger detail, the wage reimbursement detail, or the

Separation Payment detail.  Nor did she seek to depose the declarant despite having received

sufficient notice of the declaration prior to the Hearing.[7]  Senior Counsel was an employee of

Enron.  However, even a non-employee could be considered a qualified person to authenticate

business records as long as that witness understands the entity's record-keeping system and has

enough familiarity with it to explain how the record came into existence in the ordinary course of

business.  5 WEINSTEIN'S FEDERAL EVIDENCE, § 803.08[8][a] (2d ed.2004).

Moreover, the CAO, who was also Enron's managing director, testified based upon his

knowledge concerning documents which were prepared by Enron's accounting department from

its SAP computer accounting system.  As Managing Director and Chief Administrative Officer,

---

[7]The Committee also observed that as a member of senior management at Azurix or Enron, Martin would
have been aware of any witness capable of supporting her reimbursement claim, however, she did not seek to depose
any such witness during discovery.

the CAO was situated in a position that afforded him familiarity with the process by which the
relevant records were created and maintained.  Further, although Martin had sufficient notice and
the opportunity to depose Enron's witnesses or any other witness that she, as a senior executive
with either Enron or Azurix, would have known to have knowledge of the proffered business
records, she has not challenged the trustworthiness of the general ledger or the SAP system.
Moreover, even though in other contexts, the Debtors' financial accounting records have been
found to contain misrepresentations concerning the characterization, treatment and disclosure of
various sophisticated financial transactions between and among Enron and its affiliates; there has
never been any challenge to the trustworthiness of the general ledger in its reflection of inter-
company receipts and disbursements.

In light of the evidence elicited during discovery, the Court exercises its discretion and
concludes that the evidence relied upon by the CAO is trustworthy and, therefore, the evidence
presented is admissible pursuant to Fed. R. Evid. 803(6).  The absence of an inter-company
payment in those records from Azurix to Enron establishes, pursuant to Fed. R. Evid. 803(7),
that Azurix did not reimburse Enron for the Separation Payment.

Thus, the transfer of the Separation Payment was of Enron's property for which there was
no reimbursement.[8]  As this was the only aspect of Enron's prima facie showing concerning the
preferential nature of the transfer that Martin opposed in this proceeding, the Court concludes
that Enron established the elements of section 547(b).  Martin argues that even if the elements of
section 547(b) are established, nevertheless, the Separation Payment cannot be avoided because

---

[8]Even if the reimbursement was made, the payment would still have been from property of the estate to
which Martin could have argued the defense that the payment was reimbursed.  Similarly, the doctrine of earmarking
does not apply because funds had not been set aside to pay Martin.

20

it qualifies for one of the exceptions to the avoiding powers.

*Ordinary Course Defense*

Section 547(c) of the Bankruptcy Code sets forth certain exceptions to a trustee's

avoidance powers.  Subsection 547(c)(2), as applicable here in its pre-amendment version,

provided that a trustee may not avoid a transfer to the extent that such transfer was –

> (A) in payment of a debt incurred by the debtor in the ordinary course of business or
> financial affairs of the debtor and the transferee, and
> (B) made in the ordinary course of business or financial affairs of the debtor and the
> transferee, and
> (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).[9]

To avail itself of the ordinary course of business exception, the creditor who asserts it has

the burden of proof on each of the three elements by a preponderance of the evidence.  11 U.S.C.

§ 547(g).  Further, the defense is narrowly construed.  *Jobin v. McKay (In re M&L Business*

*Machine Co., Inc.)*, 84 F.3d 1330, 1339 (10th cir. 1996).

The ordinary course of business exception to the avoidance powers protects "recurring,

customary credit transactions that are incurred and paid in the ordinary course of business of the

debtor and the debtor's transferee."  *Sender v. Heggland Family Trust (In re Hedged-Investments*

*Assocs.)*, 48 F.3d 470, 475 (10th Cir. 1995).  The purpose of this exception is to leave "normal

financial relations" undisturbed.  *Id.*  Although the exception to avoidance for ordinary course

---

[9]Section 547(c)(2) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of
2005 ("BAPCPA"), Pub.L. No. 109-8, 119 Stat. 23, § 409, and currently provides that a transfer under section 547
may not be avoided
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary
> course of business or financial affairs of the debtor and the transferee, and such transfer was--
> > (A) made in the ordinary course of business or financial affairs of the debtor and the transferee, or
> > (B) made according to ordinary business terms.
11 U.S.C. § 547(c)(2).  This adversary proceeding was commenced prior to enactment of BAPCPA and, therefore,
this Opinion concerns the prior version of the section.

21

dealings conflicts with the policy goal of equality of distribution, the exception may advance the other policy goal by deterring creditors from racing to the courthouse and by enabling the debtor to continue conducting business. *Roblin*, 78 F.3d 40, (citing, *Union Bank v. Wolas*, 502 U.S. 151, 160-61, 112 S.Ct. 517, 532-33 116 L.Ed.2d 514 (1991)). At a minimum, the exception does not interfere with the goal of discouraging unusual action when the debtor is financially distressed and sliding into bankruptcy. *McKay*, 84 F.3d at 1339-40, citing, S.Rep. No. 989, 95th Cong., 2d sess. 88 (1978), 1978 U.S.C.C.A.N. 5787, 5874.

The first element of the defense is subjective and looks to proof of the parties' own prior dealings. *Lawson v. Ford Motor Co. (In re Roblin Industr., Inc.)*, 78 F.3d 30, 43 (2d Cir. 1996). The transfer at issue must be in payment of a debt that was incurred by the debtor in the ordinary course of its affairs with the creditor. *WJM, Inc. v. Massachusetts Dep't of Public Welfare*, 840 F.2d 996, 1011 (1st Cir. 1988). The second element is subjective and looks to whether the payment made is ordinary in relation to other business dealings between the parties. *Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 244 (6th Cir. 1992). The third element requires an objective inquiry that looks to whether the payment is ordinary from the perspective of the industry. *Roblin*, 78 F.3d at 40. Thus, under the third element, the transfer must comport with ordinary business terms used by similarly situated debtors and creditors faced with similar circumstances. *Roblin*, 78 F.3d at 41-42. This requires evidence of industry practice apart from a debtor's own experience. *Roblin*, 78 F.3d at 43.

The ordinary course of business exception benefits all creditors because payments to those that "remain committed to a debtor during financial distress" are protected and, at the same time, creditors are afforded flexibility in their transactions with a debtor as long as the

22

transactions comport with customary practice in the particular industry. *Roblin*, 78 F.3d at 42.

Sections 547(c)(2)(B) and 547(c)(2)(C) "comprise a subjective and objective component respectively." *Fred Hawes*, 957 F.2d at 244. This distinction was recognized by the Second Circuit in comparing the objective test required under section 547(c)(2)(C) from the subjective test required under 547(c)(2)(B), which focuses solely on the prior dealings of debtor and creditor. *Roblin*, 78 F.3d at 41.

Therefore, while section 547(c)(2)(C) focuses on the industry standard, sections 547(c)(2)(A) and 547(c)(2)(B) compare the current transaction between the parties to the prior course of dealings between the parties. The ordinary course exception requires the creditor to prove that incurring the debt was ordinary in relation to other business dealings between "that" creditor and "that" debtor. *Logan v. Basic Distribution Corp. (In re Fred Hawes Org.)*, 957 F.2d 239, 244 (6th Cir. 1992).

As previously noted, section 547(c)(2) is intended to protect recurring, customary trade transactions. Thus, certain courts have refused to apply it when confronted with a single transaction between a creditor and debtor. *Intercontinental Publications, Inc. v. Perry (In re Intercontinental Publications, Inc.)*, 131 B.R. 544, 550 (Bankr. D. Conn. 1991) (holding that section 547(c)(2) did not apply to severance payments to an editor-in-chief of a magazine for violations of an employment contract because they were not ordinary recurring transactions); *Durant's Rental Center, Inc. v. United Truck Leasing, Inc. (In re Durant's Rental Center, Inc.)*, 116 B.R. 362, 365 (Bankr. D. Conn. 1990) (declining to apply it to a one-time payment in settlement of contractual claims. *See also In re Energy Co-op, Inc.*, 832 F.2d at 1004 (same). There must be some consistency with other business transactions between the debtor and

23

creditor. *Durant*, 116 B.R. at 365 (citing *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273

(Bankr. W.D. Okla 1986)).  To determine whether there is consistency, past payment history

between the parties is compared to the course of conduct between the parties during the

preference period.  *In re Brown Transp. Truckload,* Inc., 152 B.R. 690, 691

(Bankr.N.D.Ga.1992).

Some courts, however, have found that a first time transaction may qualify as an ordinary

course of business exception to a preference recovery.  *See Huffman v. New Jersey Steel Corp.*

*(In re Valley Steel Corp.)*, 182 B.R. 728, 735 (Bankr. W.D. Va. 1995); *In re Ahaza Systems, Inc.,*

482 F.3d 1118, 1125 (9th Cir. 2007) (noting that a first time transaction is not per se ineligible to

qualify as an ordinary course transaction).  In *Kleven v. Household Bank F.S.B.*, 334 F.3d 638,

642-43 (7th Cir. 2003), the court concluded that a history of dealing between the parties is not

always required because, in the absence of any modifying behavior, the parties' ordinary course

of business could be established by the terms of the parties' agreement.  In support of the view

that a history of prior transactions between the debtor and the transferee is not required, one

court noted that the language of section 547(c)(2)(B) referenced the ordinary course of business

or financial "affairs *of* the debtor and the transferee," rather than "affairs *between* the debtor and

the transferee."  *In re Morren Meat and Poultry Co. Inc.*, 92 B.R. 737, 740 (W.D. Mich. 1988).

Thus, the *Morren Meat* court found it sufficient if the transfer were made in the ordinary course

of the parties' respective businesses.

The contrary view is that this latter interpretation violates the requirement that all terms

of a statute be given effect.  *Brown Transp.*, 152 B.R. at 692.  It is reasoned that "such a statutory

construction would make § 547(c)(2)(C) superfluous, because that subsection requires that the

transfer also be made according to ordinary business terms, which is determined by using an objective standard." *Id*. The *Brown Transp.* court found that "[m]erely showing that the actions were taken in the ordinary course of the parties' respective ordinary course of business, without showing the prior course of dealing between the parties, is not sufficient." *Id*. Thus, the *Brown Transp.* court concluded that section 547(c)(2)(B) requires a showing that the transfer was made in the ordinary course of business between the debtor and the transferee and that section 547(c)(2)(B) could not be met in the absence of a prior course of dealings between the parties. *Id*. The reasoning is that if section 547(c)(2)(B) were met merely by viewing what was ordinary for the debtor and for the creditor in transactions with other parties, it would be "tantamount to analyzing the ordinary business terms" and section 547(c)(2)(C) would be superfluous. Lisa Sommers Gretchko, PREFERENCE PRIMER: IS ONCE ENOUGH? IS THE ISOLATED TRANSACTION ORDINARY? 14 Am. Bankr. Inst. J. 22 (September, 1995). Thus, the conclusion is that strict statutory construction requires a review under section 547(c)(2)(B) of the prior course of business between the parties. Those supporting the view that there must be a prior course of dealing between the debtor and creditor reason that this interpretation "gives separate purpose and meaning to §547(c)(2)(C), which requires proof that the transfer was made according to ordinary business terms." *Id*.

> [T]he strength of [this] statutory analysis is that it accounts for all the statutory language and differentiates the proofs required under § 547(c)(2)(B) from the proofs required under §547(c)(2)(C), thereby giving effect to each statutory prong of the ordinary business exception.[10]

------

[10]Arguably, although there may be overlap with the standard in the industry, there could be aspects of a debtor's or creditor's respective course of dealing with others that is distinct from the industry standard when measured by the interaction of other participants in the industry. In that regard, section 547(c)(2)(C) would not be superfluous to the extent of any such difference.

*Id.*

As previously noted, section 547(c)(2) sets forth the criteria that must be met for the

ordinary course of business defense to be available to a creditor and requires that the creditor

establish each of the three elements.[11]  *Roblin*, 78 F.3d at 39.

Further, some courts find that the ordinary course of business exception does not apply to

a business enterprise that is not legitimate, like a Ponzi scheme, because it is unfair to relegate

some defrauded creditors to general unsecured status when other creditors are paid in full.

*Danning v. Bozek (In re Bullion Reserve)*, 836 F.2d 1214, 1219 (9th Cir. 1988);  *Graulty v.*

*Brooks (In re Bishop, Baldwin, Rewald, Dillingham and Wong, Inc)*, 819 F.2d 214, 217 (9th Cir.

1987);  *Rafoth v. Bailey (In re Baker & Getty Financial Services, Inc.*, 88 B.R. 792, 799 (Bankr.

N.D. Ohio 1988).

In *First Federal v. Barrow*, 878 F.2d 912, 918 (6th Cir. 1989), this policy was extended to

preclude application of the ordinary course defense to a legitimate business enterprise that

conducted its business operations in a "totally unorthodox and illegal manner."  In *Barrow*,

although the debtor had a legitimate mortgage business, it illegally commingled funds when it

was financially strained.  *Id*. at 914.  The court observed that the debtor's conduct in engaging in

calculated manipulations to divert and misappropriate escrow funds did not comport with

---

[11]While under the former version of section 547(c)(2), a creditor was required to establish that the transfer was "made in the ordinary course of business or financial affairs of the debtor" and also "made according to ordinary business terms," the amendment resulting from BAPCPA cast these two elements as alternative requirements by using the disjunctive "or" and, therefore, lightens the creditor's burden, making it a less rigorous standard, by allowing the creditor to establish only one or the other of these elements.  Kenneth N. Klee and Brendt C. Butler, THE BANKRUPTCY ABUSE PREVENTION AND CONSUMER PROTECTION ACT OF 2005 BUSINESS BANKRUPTCY, 38 UCC L.J. 4 Art. 1 (2006); Richard Levin & Alesia Ranney-Marinelli, THE CREEPING REPEAL OF CHAPTER 11: THE SIGNIFICANT BUSINESS PROVISIONS OF THE BANKRUPTCY ABUSE PREVENTION AND CONSUMER PROTECTION ACT OF 2005, 79 Am. Bankr. L.J. 603, 636-637 (2005).  The section, however, continues to require that a creditor establish that it was "a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2).

ordinary course business practices followed by properly conducted mortgage businesses. *Id*. at 918-919. In *McLemore v. Third National Bank (In re Montgomery)*, 123 B.R. 801, 814 (Bankr. M.D. Tenn. 1991), the court followed the analysis of the *Barrow* court and found the ordinary course of business defense unavailable to a Bank that had received transfers during the preference period from a debtor conducting a check kiting scheme. The court found that the transfers to the bank during the preference period allowed the bank to escape the debtor's fraud at the expense of other similarly situated creditors of the debtor. *Id*.

Other courts have rejected the rule that the ordinary course of business defense has no application, as a matter of law, to an enterprise that is fraudulent, like a Ponzi scheme, or to an enterprise that is partially conducted in an illegal manner. *Hedged-Investments*, 48 F.3d at 476 Rather, these courts look to the type of payment in issue and find that if the payment made is actually part and parcel of the overall fraudulent scheme or activity and in furtherance of it, the transferee is not entitled to assert the ordinary course of business defense. *Id*. However, certain other payments made to creditors by that same company might be made in accordance with ordinary business terms and in the ordinary course of business, thereby entitling the transferee to assert the ordinary course of business defense. *Hedged-Investments*, 48 F.3d at 476; *McKay*, 84 F.3d at 1340. Thus, investors in Ponzi schemes who receive payments are not entitled to assert the defense because the ordinary business terms of investment companies does not include payment to early investors of profits fraudulently derived from later investors rather than from legitimate business activity. *Jobin v. Cervenka (In re M&L Business Machine Co., Inc.)*, 194 B.R. 496, 504 (D. Colo. 1996). However, utility companies who provide services to the business may assert the defense. *Hedged-Investments*, 48 F.2d at 476.

Thus, the ordinary course of business exception prevents interference with *normal* business relations in order to allow the debtor to continue operating the business.  However, the intent of Congress could not have been to facilitate the survival of a fraudulent enterprise or a fraudulent or illegal aspect of a business.

As previously noted, the ordinary course defense was intended to "protect recurring, customary credit transactions" which are incurred and paid in the ordinary course of business of the Debtor and the transferee.  It protects "ordinary credit transactions that are kept current."  *In re Energy Co-Op Inc.*, 832 F.2d 997, 1004 (7th Cir.1987).

The Court concludes that Martin's assertion that the severance payment to her was incurred and made in the ordinary course of business or financial affairs is conclusory.  As a severance package is generally a one-time event with a particular employer, there was obviously no prior course of dealing between Enron and Martin concerning the severance payment.  Thus, a requirement for a prior course of dealing between the parties would preclude application of the defense.  The Court further concludes that the same result would occur even if the defense is applicable to a single transfer.  This is because the focus of the defense is on recurring, customary trade transactions.  Therefore, it appears that for a "first time" transfer to qualify for application of the defense, it should be of a type that could have been a "recurring, customary trade transaction" had the parties continued their business relationship - not a single isolated transaction that would never have been repeated in any case.

Further, as described, the entire transaction was not ordinary - it was unique.  The transfer was made pursuant to the Separation Agreement which was not a simple debt repayment arrangement.  Rather, it was a very complex integrated agreement that was reached during a

28

period when the value of the debtor's stock was decreasing.  Aside from the severance package,

the Separation Agreement resolved issues related to stock options that were never issued.  In

addition, it was a global agreement that released from liability Debtors and affiliates with which

Martin did not have connections.  Thus, the Separation Payment was neither incurred nor made

in the ordinary course of business or financial affairs of the debtor and the transferee, and was

not made according to ordinary business terms.

       Moreover, if Martin's contention that she was not an Enron employee is accepted, the

transfer was part of an overall transaction that was even more extraordinary.  It could not have

been in the ordinary course of business for Enron to represent itself as Martin's employer to the

IRS - or whatever authority required a representation that Enron was Martin's employer - if

Azurix was the employer.  Martin maintains that she believed that she could not receive certain

stock options unless it appeared that she were an Enron employee.  Therefore, under her version

of the facts, the representation that she was an Enron employee was part of a transaction

intended to misrepresent her employment status.[12]  Thus, even if Martin believed it was a

legitimate and ordinary business transaction for Enron to misrepresent itself as her employer for

the purpose of obtaining stock options and making salary and severance payments, section

547(c)(2) also requires that the payment be made in the debtor's ordinary course of business or

financial affairs.  *See Graulty*, 819 F.2d at 217.  *See Graulty*, 819 F.2d at 217.  The issuance of a

W-2 by Enron to Martin representing itself as the employer if she were not its employee was not

---

[12]The requirement that an employee be employed by the parent company in order to receive stock options
of the parent may have been the requirement of Enron Corp but the Court is not aware of any statute or regulation
that requires a corporation to have such a a plan restriction.

a legitimate ordinary course transaction for Enron.[13]  Thus, if Azurix were the employer, the

severance payment by Enron was not incurred or made in the ordinary course of the business or

financial affairs of Enron.

Finally, even if it were shown that Enron ordinarily transacted its business in that

manner, the transfer did not satisfy section 547(c)(2)(C) because it did not comport with ordinary

business practices followed by similarly situated enterprises in the same industry.  *Roblin*, 78

F.3d at 42;  *Barrow*, 878 F.2d at 918-19.  Applying this standard to this case, it was not a normal

term or condition for an objective employer to make salary and severance payments and falsely

issue a W-2, representing itself as the employer if it were not.

Thus, regardless of which standard is applied, the Separation Payment was not made in

the ordinary course of business of Enron.  Here, the Separation Payment was not ordinary in

relation to previous business dealings between Enron and Martin.  Nor was it the type of

payment that would be recurring if the parties had continued their business relationship.

Moreover, even if none of those standards apply, the Separation Payment was unique in that it

was part of a complex integrated settlement that resolved a vast array of issues related to

Martin's employment.  A payment made as part of a global settlement resolving myriad issues

could not be incurred or made in the debtor's ordinary course of business.  The payment proves

to be even less ordinary course if Azurix were the employer and Enron was issuing W-2 forms

misrepresenting itself as the employer.  The Separation Payment to Martin, as part of the global

settlement, was not ordinary from her perspective nor from Enron's perspective.  Neither was it

---

[13]Certainly, there would be nothing improper with an employee of a parent company being on loan to an affiliate and continuing to be treated as an employee of the parent company.  However, that is not Martin's contention.

ordinary from the perspective in the industry of parties in a similar situation to that of the debtor and creditor.

The Court concludes that the Separation Payment does not qualify as an ordinary course payment and, therefore, Martin cannot avail herself of the exception to avoidance contained in section 547(c)(2) of the Bankruptcy Code.  Thus, the Separation Payment can be avoided pursuant to section 547(b) of the Bankruptcy Code and the Court grants this aspect of the Committee's motion for summary judgment.

<em>Counterclaims and Third-Party Complaint</em>

As previously noted, Martin filed counterclaims against Enron and a third-party complaint against Azurix as well as against AWS, a successor entity to ANA.  In her counterclaims against Enron, Martin argues that Enron breached the Separation Agreement and owes her $500,000 pursuant to its terms.[14]  In addition, Martin asserts that Enron Corp made fraudulent representations to her that she would be entitled to the Separation Payment.

In the third-party complaint, Martin alleges that Azurix and AWS, as successor to ANA, are liable to her for $500,000 for breach of the Separation Agreement.  In addition, because Martin is required to return the $2.8 million dollar Separation Payment to Enron Corp as a preference, she alleges that Azurix and AWS are liable to her for breach of the Separation Agreement for the $2.8 million Separation Payment.[15]  Further, to the extent the Court determines that there has not yet been any breach, she seeks a declaratory judgment that Azurix

---

[14]Martin did not file a proof of claim against the Enron estate for this claim and, therefore, does not seek affirmative relief.  Rather, she seeks to setoff this amount against any amount she must return to Enron.

[15]Had Martin prevailed against Enron Corp concerning the preference claim, she would have sought only the $500,000 payment due under the Separation Agreement.

31

and AWS are liable to her under the Separation Agreement for the $2.8 million Separation

Payment.  Alternatively, Martin argues that if the Separation Agreement is invalid, then the

Employment Agreement remains in effect.  Martin alleges that Azurix is her employer and, as a

result, contends that Azurix is liable for the severance obligations under the Employment

Agreement and, therefore, has breached it.  In addition, Martin alleges that Azurix made

fraudulent misrepresentations to her concerning her entitlement to the Separation Payment.

With respect to the summary judgment motions filed concerning the counterclaims and

third-party claims, Martin seeks summary judgment on her claims only as against Azurix.  The

Committee's motion seeks summary judgment in its favor on the claims for breach of contract

and fraud filed by Martin as against Enron and Azurix.  The motion filed by AWS seeks

summary judgment in its favor on all of the claims filed against it.

Martin contends that Enron is liable to her for breach of the Separation Agreement and

for fraud.  However, she acknowledges that Enron made the $2.8 million dollar Separation

Payment to her and that the bankruptcy filing occurred prior to the due date of the $500,000

payment.

The bankruptcy filing intervened prior to the due date of the $500,000 installment.  As a

result, the Bankruptcy Code precluded Enron from making the payment.  Martin's avenue for

relief against Enron for not being provided with the $500,000 payment was the ability to file a

proof of claim against the bankruptcy estate for that amount.  She elected not to file a timely

proof of claim and has waived that claim against Enron.  Therefore, Enron has a defense to any

allegation of breach of contract for the $500,000 installment.

Further, once Martin repays Enron's bankruptcy estate for the $2.8 million preferential

32

payment, she is provided with a statutory remedy against the bankruptcy estate to reassert her

satisfied pre-petition claim.  Section 502(h) of the Bankruptcy Code provides that

> [a] claim arising from the recovery of property under section 522, 550, or 553 of
> this title shall be determined, and shall be allowed under subsection (a), (b), or (c)
> of this section, or disallowed under subsection (d) or (e) of this section, the same
> as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(h).  Thus, when Martin returns the Separation Payment to the Enron estate, her

claim will be determined and allowed as if the claim had arisen before the date of the filing of

the bankruptcy petition.  When a preferential payment is avoided, "[t]he obligation for which the

payment was made is revived and may be asserted against the debtor's estate because the creditor

has lost the value of the payment received."  *In re Gurley*, 311 B.R. 910, 918 (Bkrtcy.M.D. Fla.

2001).  Thus, creditors are given the opportunity "to reassert their satisfied pre-petition claims."

*Id*.  Further, "the 502(h) claim takes on the characteristics of the original claim."  *Fleet National*

*Bank v. Gray (In re Bankvest Capital Corp.)*, 375 F.3d 51, 67 (1st Cir. 2004) (concluding that the

revived claim there at issue would have the same secured status as the original claim).  While the

payment obligation is revived, the underlying contract is not rescinded as evidenced by the fact

that, pursuant to section 502(h) of the Bankruptcy Code, the claimant is allowed a pre-petition

claim against the bankruptcy estate for the obligation under the contract.

Although she waived her right to affirmatively seek to recover the $500,000 installment

because she failed to file a proof of claim, Martin argues that she has the right to setoff that

amount against the $2.8 million transfer that she must return to the Enron bankruptcy estate.

Section 553 of the Bankruptcy Code permits the setoff of mutual debts that arose before

the commencement of the case.  *In re Bennett Funding Group, Inc.*, 146 F.3d 136, 138-39 (2d

Cir. 1998).  The section preserves whatever rights of setoff a party has under applicable non-

bankruptcy law. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 289, 133
L. Ed. 2d 258 (1995). A setoff concerns a defendant reducing a plaintiff's claim against it by its
claim against the plaintiff which arises out of a different transaction than the one upon which the
plaintiff basis its claim. *Holford v. Powers (In re Holford)*, 896 F.2d 176, 178 (5th Cir.1990).
The debts are considered mutual when the debtor and creditor each incurred its debt to the other
in the same right or capacity. *Bennett Funding*, 146 F.3d at 139; *Westinghouse Credit Corp.*,
278 F.3d at 149. Whether to allow a setoff is within the sound discretion of a bankruptcy court.
*In re Bennett Funding Group, Inc.*, 146 F.3d 136, 140 (2d Cir. 1998) (citing, *In re Bohack Corp.
v. Borden, Inc.*, 599 F.3d 1160, 1165 (2d Cir. 1979)). In determining if setoff is proper, a court
must examine equitable considerations in the context of the goals and objectives of the
Bankruptcy Code. *Bennett Funding*, 145 F.3d at 140.

While Enron's obligation to Martin stems from the Separation Agreement and is a pre-
petition debt, Martin's obligation to return the preference results from the operation of the
Bankruptcy Code, and arises upon the filing of the bankruptcy case. *White v. Bradford (In re
Tax Reduction Institute*, 148 B.R. 63, 76 (Bankr. D. Col. 1992) (concluding that a preference
claim arises only on the filing of the petition).[16] Therefore, Martin's obligation to repay the
preference is not a pre-petition debt.[17] Consequently, setoff is not proper.

---

[16]The Court respectfully disagrees with the contrary position set forth in *Mktg. Resources, Int'l Corp. v.
PTC Corp. (In re Mktg. Resources Int'l Corp.)*, 35, B.R. 353, 3 (Bankr. E.D. Pa. 1984) (concluding that a claim to
recover a preference arises pre-petition)..

[17]In that regard, Martin's obligation to return the preference is distinct from the section 502(h) claim that
Martin acquires as a result of returning the preference. Pursuant to section 502(h), her claim against the estate is
considered a pre-petition claim.

34

Moreover, pursuant to section 502(d)[18] of the Bankruptcy Code, Martin is obligated to
return any preferential transfer for which she is liable prior to receipt of any amount from the
estate.  Had she filed a proof of claim for the $500,000, she could not have sought any recovery
on that amount prior to returning the $2.8 million payment.  Once she returned the preference,
she would have had a total of $3.3 million in claims against the estate for which she would have
received bankruptcy dollars.  She cannot improve her position by manipulating the process and
failing to file a proof of claim.[19]  Therefore, even if setoff were available, in its discretion, the
Court would not allow it.[20]

Therefore, the Committee is entitled to summary judgment in its favor on Martin's claim
alleging breach of contract against Enron.  The Bankruptcy Code provides Martin's remedy and
once she returns the preferential payment to the bankruptcy estate, she may assert her section

---

[18]Section 502(d) of the Bankruptcy Code provides that
    Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim
of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or
that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or
724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such
property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of
this title.

[19]*See Tax Reduction Institute*, 148 B.R. at 76, where the court noted that "in disallowing the claim of a
creditor who has not paid to the estate the amount of any avoided transfer, [section 502(d)] plainly contemplates that
there will not be setoff of such claims against avoided transfers."

[20]Similarly, the doctrine of recoupment is not applicable.  Recoupment is a process that permits a
"defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of the
same transaction to arrive at a just and proper liability on the plaintiff's claim."  *In re Kosadnar*, 157 F.3d 1011, 1013
(5th Cir 1998). Recoupment is an equitable doctrine that is allowed on a limited basis in bankruptcy cases when both
debts at issue arise out of a single integrated transaction. *Global Cable, Inc. v. Adelphia Communications Corp. (In
re Adelphia Communications Corp.)*, 2006 WL 1559437 (S.D.N.Y. 2006).  *See also*, *New York State Elec. & Gas
Corp. v. McMahon ( In re McMahon )*, 129 F.3d 93, 97 (2d Cir.1997) (noting that the doctrine of recoupment "is a
limited one and should be narrowly construed.").  Even if her obligation to return the preferential transfer to the
estate could be considered to arise under a single integrated transaction with Enron's obligation to her under the
Separation Agreement, the Court concludes that it would be inequitable to apply recoupment.  If Martin had received
the $500,000 installment, she would be required to return it to the bankruptcy estate and receive a section 502(h)
claim.  Alternatively, not having received it, if she had filed a timely proof of claim, she would have a claim against
the estate for whatever dividend the estate pays on claims.  The Court concludes that it would be inequitable to apply
recoupment to allow her to receive more than she would receive had she timely filed a proof of claim.

35

502(h) claim for the Separation Payment, however, she has waived her opportunity to assert the $500,000 claim against the Enron bankruptcy estate.

In addition, because Enron actually made the Separation Payment, there was no misrepresentation by Enron concerning that payment being provided to Martin.  Nor was there a misrepresentation concerning the $500,000 payment because, as noted, as a result of the intervening bankruptcy filing, it was the Bankruptcy Code that prevented the payment from being made.  Therefore, the Committee is entitled to summary judgment in its favor on Martin's claim against Enron for fraudulent misrepresentation.

Martin contends that upon being required to return the Separation Payment to Enron, Azurix and AWS, as successor to ANA, are liable to her for that payment.  This argument is based upon the definition of the term "Company" as used in the Separation Agreement.  Martin asserts that the "Separation Agreement" defines the term "Company" to include Enron Corp's affiliates and that because Azurix and ANA were affiliates of Enron, they had the same payment obligations to her as Enron.  Further, she argues that AWS acquired ANA'a liability with respect to the Separation Agreement when it purchased ANA's stock from Azurix.  Thus, she maintains that as successor to ANA, AWS acquired ANA's payment obligations under the Separation Agreement.  Therefore, Martin argues that Azurix and AWS  must pay her the remaining $500,000 payment under the Separation Agreement and, in addition, they must pay her the $2.8 million amount that the Court determined was avoidable.

AWS acknowledges that as successor to ANA, it would acquire any liability that ANA had to Martin under the Separation Agreement.  However, AWS maintains that ANA was not obligated to Martin under the Separation Agreement.  The Committee and AWS assert that

36

Texas law recognizes that corporations and their affiliates and subsidiaries are distinct entities
and that one cannot bind the other absent authority.  The Committee and AWS maintain that only
Enron signed the Separation Agreement and that, regardless of any defined terms in the
Separation Agreement, Enron could not bind Azurix or ANA as separate corporate entities.
Moreover, the Committee and AWS contend that accepting Martin's theory would lead to an
illogical result because it would render innumerable entities and individuals, who had not signed
the contract, liable to her for in excess of $3.3 million.  This group could include the
approximately 2,400 affiliates of Enron, as well as their officers, directors, employees,
representative and attorneys that were also included in the definition of Company pursuant to
paragraph 1.7 of the Separation Agreement.[21]

Azurix was a subsidiary and affiliate of Enron.  ANA and AIC, as subsidiaries of Azurix,
were also affiliates of Enron.  As the purchaser of their stock, AWS is the successor entity to
ANA and AIC.  As previously noted, although certain sections of the Separation Agreement
indicate that the Separation Agreement was entered into by Martin and "Company" - whether
defined as in the introductory paragraph or as defined in paragraph 7.1 of the Separation
Agreement - the signature line only contains a reference to Enron Corp.  There is no reference to
Azurix, ANA, AIC, AWS or even "Company" on the signature line.  In addition, the contract
was signed only by an employee of Enron, who was its Vice President of Executive
Compensation.  No executive or other employee of Azurix, ANA, AIC, or AWS signed the

---

[21]AWS also asserts that Martin has referred to having been very involved in the sale of the ANA and AIC
stock yet, in the transactional documents, her name was not included on the list of employees to whom ANA was
obligated for a severance payment.  AWS asserts that, despite her heavy involvement in the sale, not only did she not
seek to correct that alleged omission, she never informed the purchaser about ANA's putative liability to her for the
Separation Payment.

Separation Agreement.

Moreover, throughout the Separation Agreement, Company is used in a manner that does not always signify that it is used as the collective grouping of Enron and its affiliates nor the more expansive grouping defined in paragraph 7.1.  For example, the Separation Agreement refers to Company and Martin having entered into the Employment Agreement even though all of the subsidiaries and affiliates did not enter into that agreement.  Further, at other times, the term Company appears not to include any affiliates, such as in the "release" paragraph in which Martin agrees to release "Company, and its subsidiaries and affiliated companies, and their respective employees, officers, directors, trustees, representatives and assigns."  If the term Company included subsidiaries and affiliates, there was no need to separately list subsidiaries and affiliated companies.

Pursuant to Texas law, a corporation and its subsidiaries are distinct legal entities. *Docudata Records Management Services, Inc. v. Weiser*, 966 S.W.2d 192, 197 (Tex. App. 1998). Regardless of whether they have the same directors or managers or whether the parent corporation owns most of the capital stock of the subsidiary corporation, the parent and subsidiaries maintain their independence. *Id*.  The separate legal entity of corporations is only disregarded in instances where the "relationship is used to defeat public convenience, justify wrongs, such as a violation of anti-trust laws, protect fraud, or defend crime." *Id*.

Here, the Enron CEO negotiated the Separation Agreement and only an Enron employee signed it.  There was no written indication that the Enron employee signed on behalf of any entity other than Enron Corp, in that the more inclusive term Company[22] was not used on the

_____

[22]As previously noted, in the Separation Agreement, the term Company was not always used in its inclusive context.

38

signature line.  Inasmuch as the separate corporate entities that did not sign the Separation

Agreement, absent another justification, Azurix and ANA, as predecessor entity to AWS, cannot

be bound to its terms by the signature of the Enron representative.  Further, Martin does not

make any allegations that would support a determination to disregard their separate corporate

identities.  Indeed, Martin concedes that she is not attempting to pierce the corporate veil of any

entity.  Rather, she emphasizes that she is relying on the way in which the term "Company" is

defined in the Separation Agreement.

 AWS and its predecessor entities, ANA and AIC, were not parties to either the

Employment Agreement or the Separation Agreement - the agreements that Martin asserts were

breached.  There are no allegations that ANA gave Enron authority to bind it or made any

representations to Martin that Enron could bind it.  Nor are there any allegation that AWS or its

predecessor entities agreed to be obligated to make any payments to Martin under the Separation

Agreement or that they made any other representations concerning it.  In addition, there is no

allegation that AWS, ANA, or AIC, through corporate resolution or otherwise, agreed to permit

Enron to bind ANA or AIC to the Employment Agreement or the Separation Agreement.

Therefore, absent sufficient allegations seeking to pierce the corporate veil of the affiliates or an

allegation that there was either actual or apparent authority for Enron to bind the affiliates, the

claims against them cannot be sustained.  Thus, ANA and AWS, as successor entity to ANA, are

not obligated under the Separation Agreement and summary judgment is properly granted in

favor of AWS.

 With respect to Azurix only, Martin contends that Enron had apparent authority to act on

behalf of Azurix in negotiations with her.  Therefore, she argues that because Enron was

representing both itself and Azurix, it could bind Azurix to the obligations in the Separation Agreement. Further, she contends that if the Court determines that Azurix was not a party to the Separation Agreement, Azurix cannot obtain the benefits of the release provided for in the Separation Agreement. Rather, she alleges that Employment Agreement, which included provisions regarding severance obligations, remained in effect. These arguments are premised upon her allegations that, even after she started to receive salary payments from Enron in July of 2001, she remained an employee of Azurix up until the date of her termination from employment on January 31, 2002. Thus, she maintains that Azutrix, as her employer, breached the termination provisions of the Employment Agreement.

The Committee argues that the obligation under the Separation Agreement was discharged when Enron made the Separation Payment to Martin. The Committee asserts that the fact that the Bankruptcy Code requires the party with whom she contracted to avoid the transfer does not equate to a failure of consideration under the contract. Further, the Committee argues that Martin was not an employee of Azurix at the time of her termination because she had been assigned to Enron in July 2001, as permitted by paragraph 1.2 of the Employment Agreement. Therefore, the Committee contends that because she was not an Azurix employee and because the obligation under the Separation Agreement was discharged when Enron made the Separation Payment to Martin, Azurix cannot be liable under the Employment Agreement. The Committee further argues that, even though not a party to the Separation Agreement, Azurix was a third-party beneficiary of the release provision. The Committee also seeks summary judgment concerning Martin's claim alleging that Azurix made fraudulent representations to her that she would be entitled to the compensation under the Separation Agreement.

With respect to Martin's fraud claim as against Azurix, she alleges that it made fraudulent representations to her that she would be entitled to the compensation under the Separation Agreement.  The Committee moves for summary judgment in its favor on this aspect of the complaint because there are no allegations of misrepresentation by Azurix or any allegation that Azurix made any representations concerning the identity of the entity that would issue the payment to her.  The Committee maintains that the management of Azurix was not involved in the negotiation of the Separation Agreement.  Further, the Committee contends that Martin was a high level executive at Enron and Azurix, and had the type of access to allow her to determine the source of the Separation Payment.  Finally, the Committee asserts that scienter is an element of fraud and that Martin has not alleged that Azurix was intentionally or recklessly misleading her because the management of Azurix was not involved in the negotiations and had no control over those negotiations.

In her opposition to the Committee's summary judgment motion concerning the fraud allegations against Azurix, Martin asserts that there is an issue of fact as to whether Azurix concealed facts and failed to correct her misunderstanding as to the identity of the entity that would make the Separation Payment.  She asserts that when there is a duty to disclose, a failure in that regard is a misrepresentation.

Under Texas law, to establish fraud it must be shown that (1) a material representation was made; (2) the representation was false; (3) the speaker knew the representation was false when made or made it recklessly without any knowledge of its truth; (4) the speaker made the representation with the intent it should be acted upon by the party; (5) the party acted in reliance upon the representation; and (6) the party thereby suffered injury.  *Eagle Properties, Ltd. v.*

41

*Scharbauer*, 807 S.W.2d 714, 723 (Tex.1990).  Martin has not made any allegations that Azurix

made any representation to her as to the identity of the entity that would make the Separation

Payment.  The Separation Agreement provides that Martin would be provided with the payment

but does not identify the entity that will pay it.  Nor does Martin allege that Azurix represented

that it would pay it.  Rather, she acknowledges that she received the Separation Payment from

Enron and asserts that she assumed Azurix would reimburse Enron for the payment.  However,

there is no allegation that Azurix represented it would reimburse Enron or identified the entity

that would issue the payment to her.

Nevertheless, Martin argues that, even without an affirmative representation, failure to

disclose may form the basis for a finding of fraud.  Martin contends that the fraud claim is viable

because the information concerning the identity of the entity that would pay the Separation

Payment was known to Azurix and concealed from her.  Additionally, she asserts that Azurix

failed to correct her misunderstanding on the issue.

Pursuant to Texas law, fraud may occur when (i) a party conceals or fails to disclose a

material fact within the knowledge of that party, (ii) the party knows that the other party is

ignorant of the fact and does not have an equal opportunity to discover the truth, (iii) the party

intends to induce the other party to take some action by concealing or failing to disclose the fact,

and (iv) the other party suffers injury as a result of acting without knowledge of the undisclosed

fact.  *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001).  Generally, "a failure to disclose

information does not constitute fraud unless there is a duty to disclose the information."  *Id*. at

755.  Whether there is a duty to disclose is a question of law.  *Id*.  A duty to disclose information

has been found to arise in arm's-length business transactions when a party makes a partial

42

disclosure that, although true, conveys a false impression.  *Id*.

Here, Azurix has not made a partial disclosure that would give rise to duty to disclose. Moreover, the terms of the arrangement were incorporated into a written contract - the Separation Agreement.  Martin is a sophisticated business person and, if she had any concerns as to the identity of the entity that would actually make the Separation Payment, she could have insisted on more specificity in the agreement.  Martin was a high-level executive and the parties negotiating the contract were on a level playing field.  Thus, not only did she have an equal opportunity to discover the identity of the entity that would make the Separation Payment, it was actually an issue relevant to the negotiations that she conducted with the Enron CEO that resulted in the Separation Agreement.  Further, once the Separation Payment was made, as a high level executive at Enron and Azurix, she had the type of access to allow her to determine the source of the Separation Payment.[23]  Thus, because there were no allegations of misrepresentations by Azurix or failure to disclose information when there was a duty to disclose, summary judgment is properly granted in favor of the Committee on Martin's claim of fraud against Azurix.

The remaining portions of the summary judgment motions filed by the Committee and Martin relate to the breach of contract claims asserted against Azurix.  In their arguments, the parties focus on whether Martin was an employee of Enron or Azurix.  In addition, they dispute whether Enron was cloaked with apparent authority to negotiate on behalf of Azurix with Martin.

Martin asserts that Azurix was controlled by Enron at the time of entry into the

---

[23]In addition, regardless of any alleged representation that Azurix would be responsible for the payment, an examination of the signature line shows that it is inconsistent with her understanding.

Separation Agreement because of Enron's direct ownership of its stock combined with its indirect control through the Azurix stock owned by Enron subsidiaries. Martin argues that she was an Azurix employee who believed payment to her was to be made by Azurix. Moreover, even after she received a payment from Enron, she assumed that Enron would be reimbursed by Azurix. In her deposition, she further testified that she remained at Azurix offices, was not given a formal position at Enron and continued to report to Azurix management. Martin contends that Enron was given apparent authority to negotiate on behalf of Azurix because she was advised by a member of Enron's executive committee, to whom the employees of Azurix reported, and the President of Azurix, who by that time was also its CEO, to negotiate her exit from Azuirx with the Enron CEO, who had previously been the chairman of the board of Azurix. Martin contends that she kept those two individuals apprised of her negotiations and neither indicated that the Enron CEO had no authority to bind Azuirx. Martin argues that as a result, she believed that the Enron CEO had authority to bind Azurix and that the Enron executive who signed the contract had authority to bind both Enron and Azurix.

The Committee contends that the fact that the Separation Agreement contains only one line for a corporate signature - for Enron Corp - highlights that the Enron CEO was acting only for Enron Corp in those negotiations. The Committee further argues that Martin began to receive salary payments from Enron in June of 2001 because that was when her Employment Agreement had been assigned to Enron as permitted in paragraph 7.1 of that agreement. The Committee references the deposition transcripts of the various personnel of Enron and Azurix and the business records that reflect that Martin received all her payments from Enron, which records also reflect that the payments were not reimbursed by Azurix.

44

The Court concludes that there are factual issues in dispute as to whether Martin was an employee of Enron[24] or Azurix and whether there was apparent authority for Enron to negotiate for Azurix.[25]  Therefore, the Committee's request for summary judgment concerning Martin's breach of contract claim as against Azurix is denied and Martin's request for summary judgment that Azurix breached the contract is denied.

<em>CONCLUSION</em>

The Court grants summary judgment in favor of the Committee (i) on its claim on behalf of Enron to avoid and recover the transfer to Martin;[26] (ii) on Martin's claims for breach of contract and fraud as against Enron; and (iii) on Martin's claim of fraud as against Azurix.

---

[24]Although the Court does not reach the issue of whether Martin's Employment Agreement was assigned to Enron, the Court does address Martin's argument concerning whether, under the provision of the Employment Agreement that relates to its modification, a writing was required to assign her employment.  The Employment Agreement provides, in paragraph 1.2, that the employer "may assign [the Employment Agreement] and [Martin's] employment to Enron or any affiliates of Enron; provided, however, that [the employer] will not transfer [Martin] to a position outside of Houston, Texas.  Martin argues that a writing is required to effectuate the assignment because section 7.10 of the Employment Agreement provides, in relevant part, that "[a]ny modification of [the Employment Agreement] will be effective only if it is in writing and signed by each party whose rights . . . are affected thereby."
The Court concludes that the fact that the Employment Agreement contained a provision providing that it could not be modified without a writing does not bear on the issue of the assignment of the Employment Agreement because, in assigning the Employment Agreement and her employment, there would be no modification of the contract.  Rather, the Employment Agreement would be assigned, as written, to another entity as specifically provided for in the contract.

[25]The Committee additionally argues that, even if the Court were to determine that Azurix is liable for the Separation Payment, summary judgment on the breach of contract claim concerning the $2.8 million payment is appropriate.  The Committee contends that this is because when Enron made the Separation Payment, it discharged any obligation under the Separation Agreement, including any obligation of Azurix.  Martin argues that having to return the Separation Payment to the bankruptcy estate reinstated Azurix's obligation under the Separation Agreement.  The parties will be given an opportunity to more fully brief the issue.  In any event, its determination does not relate to the $500,000 payment obligation as that payment was not made and, therefore, is dependent upon the resolution of the factual issues.  Further, in the context of the allegation that the Enron CEO had apparent authority to sign on behalf of Azuirx, the parties should brief the significance of the Separation Agreement not including any indication on the signature line that the Enron executive was signing on behalf of any entity other than Enron Corp.

[26]The Committee has conceded that it cannot pursue the avoidance action on behalf of Azurix, which is a non-debtor.  Thus, the part of Martin's motion seeking summary judgment in her favor concerning the Committee's claim for avoidance on behalf of Azurix is granted.

45

Further, the Court grants in full AWS's motion for summary judgment in its favor.

However, because there are factual issues in dispute, the Court denies the Committee's motion for summary judgment concerning Martin's claim for breach of contract as against Azurix and also denies Martin's motion for summary judgment on her breach of contract claim against Azurix.

Counsel for the Committee is to settle an order consistent with this opinion.

Dated: New York, New York
       October 17, 2007

                                        **s/Arthur J. Gonzalez**_____
                                        UNITED STATES BANKRUPTCY JUDGE